# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

WELLS FARGO BANK, N.A.,
as Trustee,

               Plaintiff,

       v.                                           Case No. 10-C-1039

SOKAOGON CHIPPEWA COMMUNITY
(MOLE LAKE BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS)

and

SOKAOGON GAMING ENTERPRISE
CORPORATION,

               Defendants.

---

## MEMORANDUM AND ORDER

---

Wells Fargo Bank, N.A., acting as Trustee for the holders of over $19 million in bonds issued pursuant to a Trust Indenture between Wells Fargo and the Sokaogon Chippewa Community (Mole Lake Band of Lake Superior Chippewa Indians) (hereinafter "the Tribe"), brought this action for declaratory and other relief against the Tribe and Sokaogon Gaming Enterprise Corporation ("Sokaogon Gaming"), a wholly owned tribal entity that guaranteed the transaction. The case is before the Court on the Rule 12(b) motion of the defendants to dismiss for lack of subject matter and personal jurisdiction, and failure to state a claim. For the reasons set forth below, the motion will be denied.

**BACKGROUND**

**A. Factual Allegations in the Complaint**

The following factual allegations are taken directly from the plaintiff's complaint and are accepted as true for the purpose of this motion to dismiss. *Ameritech Corp. v. McCann,* 297 F.3d 582, 585 (7th Cir. 2002). On or about January 20, 2006, the Tribe issued $19.165 million in bonds in order to refinance existing debt and fund improvements in tribal land (the "Series 2006 Bond Transaction"). The bonds were issued pursuant to a Trust Indenture between the Tribe and Wells Fargo Bank. (Compl. ¶ 9.) The Indenture named Wells Fargo as the Trustee for the bondholders and authorized the Trustee to act on behalf of the bondholders. In essence, "the Series 2006 Bond Transaction, as reflected in the various agreements entered into by the parties, and by the various representations and warranties offered by the Tribe, was a loan transaction whereby $19 million was loaned to the Tribe, and the Tribe promised to repay that $19 million over a period of years, with interest." (Compl. ¶ 20.) The Bonds reflected the Tribe's obligation to repay its debt, and the Indenture, which the Tribe entered into as part of the consideration for the loan, set forth the manner in which the loan would be repaid and the consequences of the Tribe's default. (Compl. ¶ 22.) As a condition precedent to purchasing the Bonds, Wells Fargo required the Tribe to waive its sovereign immunity as it related to the Series 2006 Bond Transaction and consent to jurisdiction in both Wisconsin federal and state courts. (Compl. ¶ 12.)

Waivers of sovereign immunity were contained in two separate resolutions enacted by the Tribal Council and in various documents related to the transaction. In an initial 2005 resolution authorizing the Tribe to obtain the financing, the Tribal Council stated in part:

The Tribe hereby expressly waives its sovereign immunity from suit and any requirement for exhaustion of tribal remedies should an action be commenced on this Resolution or regarding the subject matter of this Resolution. The Tribe expressly consents to the levy of judgment or attachment of the Pledged Casino Revenues wherever located or maintained, including within the boundaries of the Tribe's Reservation, by the appropriate federal or state court.

(Compl. ¶ 18.) A separate Bond Resolution passed by the Tribal Council in 2006 stated in relevant part:

1.10 To assure the successful placement and sale of the Series 2006 Bonds, the Tribe and the Casino Enterprises will agree to various legal provisions (the "Legal Provisions") that will provide for (a) a limited waiver of sovereign immunity with respect to suits or other legal actions or proceedings arising because of disputes related to the Series 2006 Bonds or the foregoing named documents or other agreements related thereto, (b) consent by the Tribe and Casino Enterprise to jurisdiction of state and federal courts over such disputes and the enforcement of remedies related thereto, and (c) consent by the Tribe and Casino Enterprise to apply the laws of a given state in the interpretation of the foregoing documents.

* * *

3.1 The Tribe hereby expressly waives its sovereign immunity from suit and any requirement for exhaustion of tribal remedies should an action be commenced on this Resolution or the Indenture, the Guaranty, the Tax Exemption Agreement, the Private Placement Agreement or the Limited Offering Memorandum, or regarding the subject matter thereof.

(Compl. 17.) Similar language was included in each Series 2006 Bond, the Indenture, and the Offering Memorandum. The Tribe's counsel, Michael Best & Friedrich, LLP, confirmed that the Tribe and Sokaogon Gaming waived their sovereign immunity and that such waiver was valid and enforceable against the Tribe and Casino Enterprise. (Compl. ¶¶ 13-16.)

The Indenture required the Tribe to pay the Trustee a portion of the principal and interest on the Bonds on the 25th of each month. It also required the Tribe to spend at least $1 million every two years for capital improvements to the Casino Facility operated by Sokaogon Gaming. To insure

compliance with this provision, the Indenture required the Tribe to deposit $41,667 into a Capital Expenditure Fund each month. (Compl. ¶¶ 23, 26.) Failure to make the required payments or deposits constituted a default under the Indenture.

"To secure its obligations under the Indenture and Bonds, and as a material inducement for the issuance and purchase of the Bonds, the Tribe granted the Trustee a "first priority lien on and pledge of all right, title and interest in and to the Gross Revenue of the Casino Facility remaining after payment of Operating Expenses of the Casino Facility (the 'Pledged Casino Revenues')." (Compl. ¶ 31.) The Pledged Casino Revenues also included investment earnings on Gross Revenues. The Trustee perfected its first priority lien on the Pledged Casino Revenue by filing a CCC-1 financing statement with both the Wisconsin Secretary of State and the Washington, D.C., Recorder of Deeds. (Compl. ¶ 32-33.)

Sokaogon Gaming, the business arm of the Tribe, agreed to guarantee the Tribe's performance under the Indenture and Bonds. (Compl. ¶ 34.) Sokaogon Gaming gave the Trustee an absolute and unconditional guaranty, and likewise waived its sovereign immunity and granted the Trustee a first priority lien on and pledge of all right, title and interest it held in the Pledged Casino Revenues. (Compl. ¶¶ 35-40.) The Trustee perfected the first priority lien on the Pledged Casino Revenues given by Sokaogon Gaming by likewise filing a UCC-1 financing statement with the Wisconsin Secretary of State and the Washington, D.C., Recorder of Deeds. (Compl. ¶ 41.)

The Tribe's Bonds were purchased on or about January 20, 2006, and the $19 million was deposited with the Trustee. The Trustee then distributed the funds to the Tribe, which accepted and utilized the funds for various purposes, including acquisition of land and mineral rights, construction of a facility for youth programs, expansion of the Tribe's Casino Facility, acquisition

of equipment and other improvements, and refinancing of existing indebtedness. (Compl. ¶¶ 46-47.)

From January 2006 to October 2008, the Tribe complied with the terms of its agreements and representations. In November and December 2008, however, the Tribe failed to make its principal and interest payments on the Bonds and the required deposits into the Capital Expenditure Account. (Compl. ¶¶ 49-50.) The Trustee provided written notice to the Tribe of these defaults, but the Tribe made only a few partial payments of debt service for the Bonds thereafter. Since October of 2009, the Tribe has not made a single payment. (Compl. ¶¶ 52-54.) Since November of 2008 the Tribe has failed to make the required deposits to the Capital Expenditure account. Despite its guaranty, Sokaogon Gaming has also failed to make any payments. (Compl. ¶ 59.) During the course of conversations about its failure to make the required payments, the Tribe and Sokaogon Gaming, through counsel, have explained to the Trustee that they have chosen to apply Pledged Casino Revenues to other purposes instead of fulfilling their debt obligations. (Compl. ¶ 60.) On July 23, 2009, the Trustee notified the Tribe that it was exercising its right under the Indenture to accelerate the maturity of the Bonds and declare all principal and interest immediately due and owing, making the entire $19 million due and owing. (Compl. ¶ 61-64.)

The entire amount remains outstanding, and neither the Tribe nor Sokaogon Gaming have made any payments to the Trustee. Instead of paying the Tribe's obligations, Sokaogon Gaming is using the Pledged Casino Revenues to pay off a business note it gave Chippewa Valley Bank to fund the construction of a hotel near the casino (the "Hotel Loan") in violation of the Indenture. The Hotel Loan is secured by a mortgage in various properties owned by the Tribe and grants Chippewa Valley Bank a security interest in various Tribal accounts, including an account at the

Chippewa Valley Bank where the Pledged Casino Revenues are deposited. (Compl. ¶¶ 71-75.) In addition, Sokaogon Gaming has transferred at least $1.5 million to the Tribe for no consideration in the form of what it characterizes as dividends, even though Sokaogon Gaming is legally insolvent. (Compl. ¶¶ 90-93.)

On August 4, 2009, in the face of the Tribe and Sokaogon Gaming's repeated defaults, the Trustee filed suit in Forest County, Wisconsin alleging breach of the Indenture, breach of the Guaranty, right to collateral pursuant to Wis. Stat. § 409.609 and asking for the appointment of a receiver pursuant to the agreements and Wis. Stat. § 813.16(1). The Tribe and Sokaogon Gaming responded to the Trustee's state court action with a motion to dismiss in which they argued that neither the Tribe nor Sokaogon Gaming had waived sovereign immunity in Wisconsin state court and suggested that the matter belonged in federal court:

> [t]he parties agreed that any litigation in this matter would be heard in federal court. There are numerous federal questions that relate to the adjudication of this lawsuit. The Defendants are Native American entities, protected by the doctrine of sovereign immunity, which has not been waived, and retain other affirmative defenses that raise federal questions which would invoke federal jurisdiction.

(Compl. ¶¶ 94, 98.) The Tribe and Sokaogon Gaming also argued, however, that the Indenture was an unapproved management contract and thus the waiver of sovereign immunity was void under the Indian Gaming Rights Act (IGRA), 25 U.S.C. § 2711 and 25 C.F.R. § 533.7.

On November 19, 2010, with the Defendants' motion to dismiss still pending in the State Court Action, the Trustee commenced this action. The complaint seeks declaratory relief in the form of a determination that the Tribe and Sokaogon Gaming effectively waived their sovereign immunity to suit in state court and that the Indenture is not a management contract within the meaning of the IGRA. The complaint also asserts claims for breach of the Indenture, Bonds, and

6

Guaranty; possession of the collateral pursuant to Wis. Stat. 409.609; avoidance of fraudulent conveyances pursuant to Wis. Stat. § 242.07; reformation of the Indenture and Bonds; restitution; unjust enrichment; promissory estoppel; and conversion. As they did in the state court action, the Tribe and Sokaogon Gaming responded with a motion to dismiss. In support of their motion the defendants argue, in apparent contradiction with their position in state court, that this Court should abstain from hearing the case because of the pending state court action. The defendants also argue here as they apparently did in the state court action that the Indenture was an unapproved management contract and thus the waiver of sovereign immunity was void under the IGRA.

## B. The IGRA

In 1988 Congress passed the IGRA "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). The IGRA was also intended to "shield [tribes] from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and the players." 25 U.S.C. § 2702(2). To that end, the IGRA created the National Indian Gaming Commission (NIGC), 25 U.S.C. § 2704, and assigned responsibility for reviewing all management contracts that tribes propose to enter into with third party contractors to the Chairman of the NIGC. 25 U.S.C. §§ 2710(d)(9) and 2711.

A "management contract" is defined by regulation as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15. The Chairman of NIGC must approve a management contract if it meets certain

7

criteria. 25 U.S.C. § 2711(b). The IGRA also lists a set of criteria which require the Chairman to disapprove a management contract. 25 U.S.C. § 2711(e). Upon a finding that any of the provisions governing management contracts have been violated, the Chairman has the authority under the IGRA, after notice and a hearing, "to require appropriate contract modifications or may void any contract . . . ." 25 U.S.C. § 2711(f). The regulation goes further and makes all management contracts that have not been approved by the Chairman void. *See* 25 C.F.R. § 533.7 ("Management contracts . . . . that have not been approved by the Chairman in accordance with the requirements of part 531 of this chapter and this part, are void."). Here, it is undisputed that the documents signed by Wells Fargo and the Tribe were never approved by the Chairman of the NIGC.

While the state court action was pending Wells Fargo requested a "declination letter" from the NIGC stating that the Indenture is not a "management contract" under IGRA. On May 27, 2010 the NIGC's General Counsel issued a declination letter stating that three of the four provisions that the Tribe argued rendered the Indenture a "management contract" did not have such an effect. As to the fourth provision, which required the Tribe to retain a consultant if there was a breach of debt service, the General Counsel declined to offer an opinion. (Slade Aff., Dkt. 5 at ¶ 37, Ex. S.)

## ANALYSIS

### A.  Subject Matter Jurisdiction

Before addressing the issues of abstention and sovereign immunity that the defendants raise in their motion to dismiss, it is first necessary to determine whether federal subject matter jurisdiction exists over this case on a more fundamental level. *See Smoot v. Mazda Motors of America, Inc.*, 469 F.3d 675, 678 (7th Cir. 2006) ("[The fact that limits on subject-matter

jurisdiction are not waivable or forfeitable-that federal courts are required to police their jurisdiction-imposes a duty of care that we are not at liberty to shirk."). District courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In its complaint Wells Fargo alleged that this "Court has subject matter jurisdiction over Plaintiff's declaratory judgment claims pursuant to 28 U.S.C. § 1331 as they present federal questions regarding: (1) the waiver of sovereign immunity by a federally recognized Indian tribe and (2) the interpretation of 25 U.S.C. § 2711 and 25 C.F.R. § 502.15." (Compl. ¶ 5.)

Upon its initial review of the defendants' motion to dismiss and the parties' briefs, the Court directed the parties' attention to *Public Service Commission of Utah v. Wycoff*, 344 U.S. 237, 248-49 (1952), and *Northeast Illinois Regional Commuter Railroad Corporation v. Hoey Farina & Downes*, 212 F.3d 1010, 1014 (7th Cir. 2000), and ordered supplemental briefing on the issue of whether the Court had jurisdiction. (Dkt. 15.) Of particular concern to the Court was whether Wells Fargo's claims for declaratory relief stated claims arising under federal law or merely anticipated federal defenses the defendants would likely raise. If the latter, then it appeared federal question jurisdiction may be lacking. *See Northeast Illinois Regional Commuter Railroad Corp. v. Hoey,* 212 F.3d at 1014 ("if the plaintiff cannot get into federal court by anticipating what amounts to a federal defense to a state-law cause of action, he also should not be able to use the Declaratory Judgment Act to do so by asserting what is really a preemptive federal defense as the basis of his complaint.") (quoting *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950)). The Court also observed that diversity jurisdiction also seemed to be lacking since Indian tribes are not considered citizens of any state. *See Miccosukee Tribe of Indians of Florida v. Kraus-Anderson Construction Company*, 607 F.3 1268, 1276 (11th Cir. 2010).

9

The parties filed their supplemental briefs in response to the Court's request and, not surprisingly, the defendants contend that subject matter jurisdiction is lacking and its motion to dismiss should be granted for that reason as well. Wells Fargo seems to concede that diversity jurisdiction does not apply – at least it does not argue the point in its various briefs. Wells Fargo does argue, however, that declaratory judgment actions that seek a determination of the validity of agreements with Indian Tribes under federal regulations invoke federal question jurisdiction. The Court agrees.

Federal courts may entertain claims for declaratory relief under 28 U.S.C. § 2201, so long as they raise a federal question. *See Illinois v. General Electric Co.,* 683 F.2d 206 (7th Cir. 1982). Here Wells Fargo seeks a declaration that the Indenture is not a management contract within the meaning of 25 U.S.C. § 2711 and that the Tribe waived its sovereign immunity. (Complaint ¶ ¶ 107-114.) The "management contract" issue underlies Wells Fargo's claim that the Tribe breached the Indenture. (Complaint ¶ ¶ 120-124.) To prevail on that claim Wells Fargo must prove the Indenture is a valid contract. Wells Fargo bears the burden of proving each element of its claim – and one element of its claim for breach of the Indenture is that the Tribe entered into a valid contract. The determination whether Wells Fargo can establish that element requires the application of federal law.

This issue was addressed by the Eighth Circuit in *Gaming World International v. White Earth Band of Chippewa Indians*, 317. F.3d 840 (8th Cir. 2003). There a casino operating company sought a determination that its contract with an Indian tribe to construct and operate a casino was valid, and an order compelling the tribe to arbitrate their dispute over the tribe's termination of the contract. As in this case, the validity of the contract depended on application of the IGRA.

10

However, in *Gaming World International* the issue was whether the management contract had been properly approved, not whether the contract at issue actually was a management contract. The district court concluded that the arbitration clause was severable and binding, regardless of whether the contract as a whole was void, rejected the tribe's contention that the plaintiff should be directed to first exhaust tribal remedies, and ordered the parties to arbitration. 317 F.3d at 846. The tribe appealed.

Before turning to the substantive issues the parties had raised, the Eighth Circuit addressed the issue of subject matter jurisdiction. The Court acknowledged that "jurisdiction cannot be founded on anticipated defenses or responsive pleadings, but then noted that "there is a significant distinction between ordinary contract disputes involving Indian tribes . . . . and those raising issues in an area of extensive federal regulation." *Id.* at 847. By way of example, the Court noted that in *Comstock v. Alabama and Coushatta Indian Tribes*, 261 F.3d 567, 574-75 (5th Cir. 2001), *cert. denied*, 535 U.S. 971 (2002), the Fifth Circuit held that "the 'extensive regulatory scheme' governing tribal oil and gas leases conferred federal jurisdiction over a contract dispute between a tribe and two oil companies." *Id.* at 847-48. "The regulatory scope of IGRA," the Court observed, "is similarly far reaching in its supervisory power over Indian gaming contracts." *Id.* at 848. Indeed, the Court had previously found that the "IGRA completely preempts state law with respect to Indian gaming." *See Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 547 (8th Cir. 1996) ("We therefore conclude that IGRA has the requisite extraordinary preemptive force necessary to satisfy the complete preemption exception to the well-pleaded complaint rule."). The dispute could not, therefore, be characterized as a routine contract dispute and thus, the court concluded, the complaint invoked federal jurisdiction. *Id.* at 574-75. *See also Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*, 63 F.3d 1030, 1047 (11th Cir. 1995) (noting that contract

"incorporates-by operation of law if not by reference-the provisions of IGRA and the NIGC's regulations that govern [tribe's] operations").

While it does not appear that the Seventh Circuit has addressed the issue, the Court is persuaded by the reasoning set forth by both the Eighth and Eleventh Circuits that federal question jurisdiction does exist. Wells Fargo's claim for breach of the Indenture does not present a routine contract dispute, but rather a specific issue under a highly regulated area of federal law. *See Gaming World,* 317. F.3d at 848. ("since this case raises issues under the extensive regulatory framework of IGRA, it is not a routine contract dispute."). Wells Fargo's action on the Indenture and Bonds necessarily raise federal questions concerning whether the Indenture is a management contract within the meaning of the IGRA and, if so, whether the Tribe's waiver of sovereign immunity is valid. Wells Fargo's complaint therefore invokes federal jurisdiction, and the Court will proceed to the grounds asserted in the defendants' motion.

**B. Abstention**

The defendants argue that this Court should abstain from hearing this case under the *Wilton/Brillhart* doctrine because there is a parallel state court proceeding between the same parties involving essentially the same issues. *See generally Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491, 494 (1942); *see also Wilton v. Seven Falls Co.,* 515 U.S. 277, 286 (1995). Under this doctrine, "district courts possess significant discretion to dismiss or stay claims seeking declaratory relief, even though they have subject matter jurisdiction over such claims." *R.R. Street & Co., Inc. v. Vulcan Materials Co.,* 569 F.3d 711, 713 (7th Cir. 2009). In *Brillhart*, the Court explained that "[o]rdinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues,

not governed by federal law, between the same parties." *Id.*, at 495. In *Wilton*, the Court reaffirmed *Brillhart*'s essential holding and made clear that where the only relief sought was declaratory, district courts retained significant discretion to dismiss or stay the case and were not required to find the exceptional circumstances required to abstain in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). In this case, Wells Fargo has asserted claims for coercive as well as declaratory relief. Since the claims for non-declaratory relief are dependent on the claims for declaratory relief, however, the *Wilton/Brillhart* discretionary standard applies. *R.R. Street & Co.*, 569 F.3d at 716-17. Applying that standard here, the Court concludes that abstention would be inappropriate.

Arguably, the defendants' abstention argument is moot since the state court dismissed Wells Fargo's State Court Action on January 21, 2011, albeit without prejudice. (Decl. of Meredith Wilkerson, ¶¶ 6-7.) Absent a parallel state court action, neither the *Wilton/Brillhart* doctrine nor *Colorado River* apply. Indeed, absent a parallel state court action, there is nothing for the federal court to abstain from. The defendants argue, however, that because the dismissal was without prejudice and they have since filed a motion for reconsideration and a notice of appeal from the state court's decision to dismiss the case without prejudice, the parallel state action is still pending and their argument for abstention is not moot. (Reply Br., Dkt 14 at 2; Ex. 1) The defendants' argument is weakened by the fact that even a dismissal without prejudice will prevent the waste of judicial resources and threat to federal/state comity the *Wilton/Brillhart* doctrine is intended to prevent. Given the dismissal, this Court's refusal to abstain can not be considered "gratuitous interference." *Wilton*, 515 U.S. at 283. But even if the defendants are correct and their abstention argument is not moot, the result would be the same.

The primary reason the defendants argument for abstention should be rejected is that they took the exact opposite position in state court. There, in support of their argument for dismissal of the State Court Action, the defendants argued that Wells Fargo should have brought its claims in federal court:

> The Tribe agreed to waive its sovereign immunity on the condition that any litigation involving the Indenture would be heard in federal court, specifically the Eastern District of Wisconsin, Green Bay Division. The Tribe only agreed to submit to state court jurisdiction if and *only if* the federal court declined jurisdiction. Since Plaintiff has not requested the federal court to take jurisdiction, which would be appropriate to decide the federal questions at issue in this case, the Defendants have not effectively waived their sovereign immunity to be sued in state court.

(Slade Aff. ¶ 33, Ex. P, Def.'s Mot. to Dismiss Am. Compl. at 2.) It was in response to the defendants' motion to dismiss the State Court Action that Wells Fargo, now convinced that federal jurisdiction did exist, commenced this action in federal court and, in addition, filed a responsive brief in the State Court Action indicating it did not object to dismissal, provided the federal court exercised jurisdiction over the claims. (Wilkerson Decl. ¶ 2, Ex. A, Pl.'s Br. In Opp. at 2-3, 17 n. 13.) Under these circumstances, the defendants are judicially estopped from arguing that this court should abstain.

The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n. 8 (2000). "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895). The purpose of the doctrine is "to protect the integrity of the judicial process . . . .

14

by prohibiting parties from deliberately changing positions according to the exigencies of the moment," *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotes and citations omitted). Having successfully convinced the state court that the case belonged in federal court, and having induced Wells Fargo to acquiesce, the defendants should not be heard to now argue that the federal court should abstain from deciding it.

Lastly, the Court also declines the defendants' request that it abstain from deciding the case because the issues raised are predominantly issues of federal law. As discussed above, the validity of the Indenture and the effectiveness of the Tribe's waiver of sovereign immunity required a determination whether the Indenture is a management contract within the meaning of the IGRA. Assuming, as the Court has already found, that federal question jurisdiction exists, federal court is the more appropriate forum to decide the complex questions of federal law, both statutory and regulatory, that the case presents. Moreover, all of the parties are amenable to federal jurisdiction and all of the claims fall within the Court's original or supplemental jurisdiction. Finally, the magnitude of the case and the need for prompt resolution warrant proceeding since the state court action has been dismissed. For all of these reasons, the Court declines to abstain.

## C. Sovereign Immunity

The defendants argue that principles of sovereign immunity prevent the Court from exercising jurisdiction over the Tribe and Sokaogon Gaming. In general suits "against Indian tribes . . . are barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991). The defendants contend that the waiver of sovereign immunity contained in the Indenture is invalid because the Indenture is unenforceable under the IGRA as an unapproved management

contract. In support of their argument, the defendants draw heavily from the decision of the United States District Court for the Western District of Wisconsin in *Wells Fargo Bank, N.A. v. Lake of the Torches Economic Development Corporation*, 677 F. Supp.2d 1056 (W.D. Wis. 2010). In that case, the court ruled that a similar trust indenture, also with Wells Fargo as trustee, was an unapproved management contract within the meaning of the IGRA, and dismissed the trustee's action for appointment of a receiver after the tribe had defaulted on its obligations relating to the repayment on bonds valued at more than $46 million. The case is currently on appeal. The defendants also argue that the Indenture is invalid because it constitutes an unapproved encumbrance of Indian Lands. Any agreement that encumbers Indian Lands is invalid unless approved by the Secretary of the Interior. 25 U.S.C. § 81. The fact that the Indenture was not approved by the Secretary of the Interior, the defendants contend, is an additional reason that the Indenture is invalid and the waiver of sovereign immunity ineffective.

Wells Fargo argues that the Indenture is not a management contract as that term is defined in the IGRA and that it does not encumber Indian Lands. Even if the Indenture was a management contract, however, Wells Fargo argues that dismissal would be improper for several reasons. First, the defendants waived sovereign immunity in four other documents besides the Indenture, so even if the Indenture is void, the Tribe's waiver of immunity survives. Second, if any provision of the Indenture appears to extend management control over gambling operations, that provision can be severed from the agreement without voiding the entire Indenture and the waiver of immunity. Finally, Wells Fargo argues that even if the Indenture is invalidated, its equitable claims survive.

### 1. Management Contract

The IGRA regulations define "management contract" as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a

subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15. While neither the statute nor the regulations define management, the regulations do define a "primary management official" as any person who "has authority . . . to set up working policy for the gaming operation." 25 C.F.R. § 502.19(b)(2). Additional guidance is available in an NIGC Bulletin discussing in general terms the difference between management contracts and consulting agreements (NIGC Bulletin 94-5, available at /www.nigc.gov/Reading_Room/Bulletins/Bulletin_No._1994-5.aspx), as well as an Opinion Letter authored by the Acting General Counsel for the NIGC in response to request for review of the Indenture and related documents by Wells Fargo during the pendency of the State Court Action. (Slade Aff., Ex. S.) The Bulletin and Opinion Letter, which are not subject to agency rule-making procedures, do not warrant *Chevron* deference. *First American Kickapoo Operations, L.L.C. v. MultiMedia Games, Inc.*, 412 F.3d 1166, 1174 (10th Cir. 2005) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)). But they can be considered by the court to the extent they are persuasive. *Id.*

Bulletin 94-5 defines management broadly to include "planning, organizing, directing, coordinating, and controlling . . . all or part of a gaming operation." NIGC Bulletin 94-5 at 2. The Bulletin singles out seven management activities as especially probative of the question whether an agreement is a management contract. These include:

* Maintenance of adequate accounting procedures and preparation of verifiable financial reports on a monthly basis;

* Access to the gaming operation by appropriate tribal officials;

* Payment of a minimum guaranteed amount to the tribe;

17

     \*      Development and construction costs incurred or financed by a party other than the tribe;

     \*      Term of contract that establishes an ongoing relationship;

     \*      Compensation based on percentage fee (performance); and

     \*      Provision for assignment or subcontracting of responsibilities.

*Id.* at 2-3. An agreement need not include all seven activities to be a management contract; the "presence of all or part of these activities in a contract with a tribe strongly suggests that the contract or agreement is a management contract requiring [NIGC] approval." *Id.* at 2.

     The Indenture and other documents relating to the Series 2006 Bond Transaction confer none of these responsibilities on the Trustee with respect to the Tribe's gaming operation. The Trustee was not responsible for the maintenance of accounting procedures or preparation of financial reports. The Indenture is silent as to access to gaming operations by appropriate tribal officials, and provided for no minimum payment to the Tribe by the Trustee. There is no provision requiring development or construction costs to be incurred or financed by any entity other than the Tribe, and the Trustee was entitled to payment of the principal and interest due on the Bonds, not a percentage fee based on performance. Although the Indenture authorized the Trustee in the event of a default to file suit and request the appointment of a receiver "of the Trust Estate and of the revenues, issues, payments and profits thereof, pending such proceedings, with such powers as the court making such appointment shall confer" (Compl. Ex. A, Indenture § 8.04), this is not an assignment or subcontracting of responsibilities. The Trust Estate consists of the Pledged Casino Revenues which are the net revenues after the payment of the Casino operating expenses. As the General Counsel for the NIGC pointed out in her Opinion Letter, "[e]xcluding operating expenses

18

from gaming revenues in which a party is granted a security interest ensures that the secured party cannot manage the gaming facility should the tribe default." (Slade Aff., Ex. S at 4.)

The Tribe argues, however, that two other provisions of the Indenture, specifically, the Capital Expenditures Fund (Indenture §§ 5.04 and 6.15) and the Debt Service Coverage (§ 6.13), are also similar to provisions of the Indenture at issue in *Lake of the Torches* and require a finding that the Indenture here is also a management contract. These provisions were also addressed by the General Counsel for the NIGC and were also found to differ in material ways from the provisions at issue in *Lake of the Torches*. Only one of the provisions cited by the Tribe, the Debt Service Coverage, gave the General Counsel pause in her review to determine whether the Series 2006 Transaction documents constituted a management contract.

The Debt Service Coverage provision requires the Tribe to "conduct the operations of the Casino Enterprise in such a manner as to provide Income Available for Debt Service at least equal to 150% of Total Principal and Interest Requirements for each twelve-month period of operation of the Casino Enterprise . . . ." (Indenture § 6.13.) In the event the ratio is not met, the Tribe is required to hire an independent consultant "acceptable to the Trustee." (*Id.*) The independent consultant, which may be "a consulting firm recognized for its experience in the field of tribal casino gaming or a firm of certified public accountants," is then "to make recommendations with respect to fees, charges, operating expenses, and other matters relating to or affecting said Income Available for Debt Service . . . ." (*Id.*) The Indenture provides that "the Casino Enterprise will, to the extent permitted by law, follow the recommendations of the Independent consultant unless the Tribal Council in good faith resolves in writing delivered to the Trustee on or before 45 days of receipt of the recommendations of the Independent consultant that such recommendations are not

in the best interest of the Casino Enterprise and that a proposed alternate set of recommendations of management are likely to achieve the 150% debt service ratio . . . ." (*Id.*) So long as the Casino Enterprise continues to follow the recommendations of the Independent consultant and any supplements thereto, or such alternate recommendations from management accepted in good faith by the Tribal Council, the Tribe is deemed to be in compliance with the provision even if the debt service ratio remains less than 150%. (*Id.*)

The Tribe argues that the Debt Service Coverage provision transforms the Indenture into a management contract because it requires the Tribe to hire an Independent consultant "acceptable to the Trustee," who then makes recommendations "with respect to fees, charges, operating expenses, and other matters relating to or affecting revenue." (Def.'s Br. at 14 (quoting § 6.13).) These are clearly management functions, the Tribe contends, and because the Trustee has control over the choice of the consultant, the Trustee has the opportunity to control the management of the casino. (*Id.*)

What the Tribe ignores, however, is the fact that the Tribe is not required to accept the recommendations of the Independent consultant. The Debt Service Coverage Covenant requires only that the Tribal Council consider the recommendations. The Tribal Counsel may then reject the consultant's recommendations if it concludes in good faith that the consultant's recommendations are not in the best interest of the Casino Enterprise and that the alternative recommendations of management are likely to achieve the required debt ratio. (Indenture § 6.13.) Requiring the Tribe simply to consider recommendations of an independent consultant if the debt service ratio falls below an agreed upon percentage is not sufficient to convert the Indenture into a management contract. *See U.S. ex.rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 425 (8th Cir. 2002) (noting

20

that provision mandating compliance with consultant's recommendations would transform a consulting agreement into a management contract). Unlike *Lake of the Torches*, the Tribe is not required to "use its best efforts to implement the recommendations of the management consultant within ninety (90) days . . . ." 677 F. Supp.2d at 1060, n. 1. For this reason, the Debt Service Coverage Covenant does not convert the Indenture into a management contract.

Lastly, the Tribe contends that the Capital Expenditures provision transferred management control over the gaming operations to the Trustee so as to render the Indenture a management contract. Under the Capital Expenditures provision of the Indenture, the Tribe agreed to make monthly deposits of $41,667 into a capital expenditures account and to spend at least $1 million on casino capital expenditures every two years. (Indenture § 5.04.) The Tribe argues that this provision "not only dictates how much it must spend in capital expenditures, and when it does so, but it also limits the Tribe's discretion over what it spends the money on." (Def.'s Br. at 10.) The Tribe also argues that it can access the money in the capital expenditure account only with the permission of the Trustee. As a result, the Tribe argues that the provision gives the Trustee control over the Tribe's ability to even buy new equipment, which is part of the gaming operation. To the extent it removes control over part of the Tribe's gaming operation, the Tribe argues, the Indenture must be considered a management contract. (*Id.*)

As the NIGC's General Counsel noted, however, the Tribe is not required to obtain approval from either the Trustee or the Bondholders in order to make capital expenditures. In this respect also, the Indenture in this case is unlike the one before the court in *Lake of the Torches*. There, the written consent of a majority of the bondholders was required in order for the tribe to spend more than 25% of what was spent on capital expenditures the previous year. (Slade Aff. Ex. S at 4 (citing

*Lake of the Torches*, 677 F. Supp.2d at 1059-60)). Moreover, the fact that the Indenture requires the Tribe to set aside a certain amount for capital expenditures does not give the Trustee control of capital expenditures; it simply means that the Tribe has already agreed that that is the amount it will set aside for that purpose. Finally, the requirement that the Tribe issue a draw request to withdraw funds from the capital expenditure account also does not give control over such expenditures to the Trustee. As the NIGC General Counsel observed, there is no provision giving the Trustee discretion to deny such a request, unless the Tribe is in default, in which case the Trustee has no discretion to transfer funds to the Tribe. (Slade Aff. Ex. S at 6 (citing Indenture § 8.05.)) In short, while the Tribe agreed that it would spend a certain amount of money on capital expenditures every two years, the Trustee was granted no power to control *how* the Tribe spent such money. The Capital Expenditure provision thus does not turn the Indenture into a management contract.

For all of the foregoing reasons, the Court concludes that the Indenture is not a management contract within the meaning of the IGRA.

### 2. Encumbrance of Indian Lands

The Tribe also argued in its opening brief that the Indenture is void because it encumbers Indian Lands and therefore required approval of the Bureau of Indian Affairs (BIA) under 25 U.S.C. § 81. In response, Wells Fargo agreed that 25 U.S.C. § 81 prohibits encumbrances on "Indian Lands" for more than 7 years without approval from the Secretary of the Department of the Interior, but noted that the land at issue here is not "Indian Land" within the meaning of that section. The term "Indian Lands" is defined by the statute to mean"lands the title to which is held by the United States in trust for an Indian tribe or lands the title to which is held by an Indian tribe subject to a restriction by the United States against alienation." 25 U.S.C. § 81(a)(1). According to Wells

Fargo, none of the land subject to the negative pledge in section 6.14 of the Indenture is trust land. Instead, Wells Fargo contends, it is fee land which is not subject to regulation under section 81. Wells Fargo notes that the Tribe apparently agrees since it encumbered the same land with a mortgage to secure the loan for the construction of its hotel.

In addition, Wells Fargo argues that unlike a mortgage, the negative pledge in the Indenture is not an "encumbrance" as that term is defined in the regulations. *See* 25 C.F.R. § 84.002 ("Encumbrances covered by this part may include leasehold mortgages, easements, and other contracts or agreements that by their terms could give to a third party exclusive or nearly exclusive proprietary control over tribal land."). The negative pledge, Wells Fargo contends, "does not give Wells Fargo 'exclusive or nearly exclusive' proprietary control over the subject land and thus, does not constitute an encumbrance for which governmental approval would be necessary." (Pl.'s Resp. at 27.)

The defendants did not reply to Wells Fargo's argument that section 81 did not apply to the Indenture because the subject land did not constitute Indian Lands as that term is defined in that section and because the negative pledge is not an encumbrance. The Court will therefore accept Wells Fargo's argument for purposes of the instant motion. *See Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 673 (7th Cir. 1998) ("[S]ilence about facts does constitute a waiver of the specific factual contentions made by the opposing party in a brief filed earlier.") (citing *Hardy v. City Optical, Inc.*, 39 F.3d 765, 771 (7th Cir. 1998)). The failure to obtain the approval of the Secretary of the Department of the Interior for the Indenture therefore does not render it void and the Tribe's waiver of sovereign immunity is valid.

**CONCLUSION**

For the reasons set forth above, the Court concludes that it has jurisdiction in this matter and that the Indenture and related documents do not constitute management contracts within the meaning of the IGRA.  Nor does the Indenture encumber Indian Lands within the meaning of 25 U.S.C. § 81.  It thus follows that the approval of neither the Chairman of the NIGC nor the Secretary of the Department of Interior was required.  The Tribe's waiver of sovereign immunity over disputes related to the Series 2006 Bond Transaction is therefore valid, and the defendants' motion to dismiss is denied.  The Clerk is directed to contact the parties forthwith to set this matter on the Court's calendar for a telephone status conference to discuss Wells Fargo's pending motion for a preliminary injunction.

**SO ORDERED** this    15th    day of April, 2011.


  s/ William C. Griesbach
William C. Griesbach
United States District Judge